# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA CHARLOTTE DIVISION

FATIHAA CARROLL, Plaintiff

V

TYSON FARMS INC, Defendant

FILED
CHARLOTTE, NC
AUG 04 2025
US DISTRICT COURT
WESTERN DISTRICT OF NC

**AMENDED COMPLAINT FILED
PURSUANT FED.R.CIVI.P 15(a)(1(B)**

**JURY DEMANDED**
Case No;.3:25-cv-00191

NOW COMES, FATIHAA CARROLL, Pro se, Plaintiff in the above-captioned cause, filing suit alleging violations of both federal and state laws, including the Fair Labor Standards Act, 29 U.S.C. §§ 206, 207, 216, North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.4, 95-25.6, and 95-25.13. Wrongful termination: Constructive Discharge in violation of the Fair Labor Standards Act 29 C.F.R. § 785.19- 785.18, and Intentional infliction of emotional distress against Defendant, TYSON FARMS INC.

Jurisdiction

1) Plaintiff is a resident of Union County North Carolina.

2) Defendant does business in Union County North Carolina.

3) The amount of damages requested supersedes $250,000, therefore the North Carolina Superior Court has jurisdiction.

4) This complaint alleges federal and state violations.

## Background

The petitioner started her employment with Tyson Farms, Inc., a subsidiary of Tyson Foods, in February 2024 as a packer. Her employment location was at the Monroe, NC branch, and she worked the 2nd shift, which was advertised from 5:30 pm to 2:30 am, Monday through Friday, with occasional Saturdays. During orientation week, the manager and trainer had all 25-30 newly hired employees in a classroom watching videos that detailed the responsibilities of their positions, the array of opportunities for promotions available to long-term and full-time employees, OSHA requirements, and safety rules and regulations. In addition to watching the videos, the employees played a "get to know each other" game as instructed by the trainer and answered questions about each video they watched. This lasted for two days, and on the third day, the employees were sent to their assigned stations on the work floor. Before entering their assigned stations, the trainer walked the employees through the process of accessing the floor, clocking in and out, obtaining their protective equipment (PPE), and showing them where the cafeteria was located.

Additionally, they were instructed to find parking in the employee parking lot. The time was roughly 9 pm when we went on the floor, and the training began. We were told that for the first two weeks, we would get clocked in and out manually by our supervisors as we wait for the badges to arrive.

Beginning week two, the plaintiff arrived at work at 5:00 pm, 30 minutes early from her scheduled shift, and looked for parking. After remembering the trainer's instructions and the employee parking lot requirement, she drove to the back of the chicken plant. Shortly, the plaintiff realized that there was no parking space available. After driving through the lot for 10 minutes, the plaintiff found a parking spot at the very back of the lot. The plaintiff parked her car and began putting on her steel-toe work boots and her coat, gathering her things. By this time, it

was 5:15 pm. The petitioner wanted to be early, so she began walking to the employee entrance. While walking, she noticed that she had underestimated the distance of the walk. By now, it was a little after 5:20 pm, and she still had to explain to the security guard that she hadn't had her badge to show. After debating with the security guard, she was finally let into the entryway. Here, the petitioner once again underestimated the number of people that worked this shift and found out quickly that due to the overcrowding, she would be late clocking in.[1]

The time clock for her assigned area was located behind the cafeteria. Entering the cafeteria, the seats and benches were complete with employees and their bags. The cafeteria area had a maximum of 250 occupants seated and in line waiting for food, after shuffling past the dozens of employees with PPE still on and rushing to leave the work area. The petitioner arrived at the PPE and time clock area at 5:35 pm.

Lunch

The first lunch period arrived, and everyone with a badge clocked their removal of PPE, walked to the time clock, and entered the cafeteria. The plaintiff was instructed to use the restroom after clocking out for her break. Arriving at the bathroom, the petitioner noticed that there were only four stalls, three of which were operational. See Exhibit B. There were many women in the bathroom, so she decided to go to another bathroom. The main restroom had more stalls, but for some reason, it was very hot because the heat remained on in this restroom. After finding a stall to use and rushing out of the heated bathroom, the petitioner stood in line to pick and pay for her lunch. The line was so long that other employees began to joke that their break time would run out by the time they could pay for their food. Although the plaintiff didn't have a badge, this still stressed her out because a point system was in place. The plaintiff noticed her

supervisors were already seated and eating their food. After standing in line for 10 minutes, the plaintiff looked around the room for an extra seat. After realizing there wasn't any, she noticed people sitting on the ground to eat and standing outside the cafeteria. She decided just to sit in her car. After making it down the stairs, she remembered that due to the overcrowded lot, she had parked in the very back, which was at least a 5-minute walk away. By the time she got to her car to eat, her 30-minute unpaid lunch break was over.

After returning to work from her first lunch break, she was told by her Supervisor that she was late. The petitioner went back to working on the line when her supervisor stood behind her and her coworkers and began instructing them to work faster. Before it was time for everyone's second break, the supervisor explained to the new hires that, from this point forward, overtime would be mandatory. The plaintiff inquired about when the shift would end, and she was told that, despite the employment contract, there is no set time. The petitioner mentioned to her supervisor how difficult it is to utilize all of her break time due to the restrictions she has experienced thus far.

This routine continued for a few months before the petitioner began to feel ill, irritable, fatigued, and with body aches. She later went to the hospital because she was feeling so bad. During this time, the plaintiff's skin began to react in a way that signals stress. Her eyes were puffy, and her face was swollen due to the lack of sleep and rest she was experiencing. See Exhibit C.

During this time, the petitioner had been working from 5:30 pm, receiving partial breaks, and leaving work between the hours of 3:30 am and sometimes 5:00 am. After five months of this routine, the petitioner submitted her two weeks due to health concern, after she had

accumulated 13 points due to the break time obstacles and health-related call-outs and was officially terminated.

## Rules of Law Violated

### Count 1. Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 206, 207, 216

- Plaintiff realleges and incorporates the preceding paragraphs fully set forth herein.
- Under the Fair Labor Standards Act (FLSA), any time an employee is required to be at work, preparing for work ( such as donning PPE, waiting to clock in, and walking long distances) is likely compensable.

### Count 2. North Carolina Wage and Hour Act (NCWHA), N.C. Gen. Stat. §§ 95-25.4, 95-25.6, and 95-25.13

- Plaintiff realleges and incorporates the preceding paragraphs fully set forth herein.
- Under the NCWHA, employers must pay employees for all wages and compensation due for all hours worked. This includes time spent performing tasks that are integral and indispensable to the primary job duties.
- The plaintiff was never compensated for the indispensable tasks performed before and after working on the line. Her supervisor and trainer told her and other coworkers regularly to clock out immediately before obtaining more PPE during meal periods.

### Count 3. Constructive Discharge in Violation of the Fair Labor Standards Act

- Plaintiff realleges and incorporates the preceding paragraphs fully set forth herein.
- The plaintiff was subjected to unlawful working conditions, including failure to be paid for all pre- and post-shift duties, denial of bona fide meal periods as required under 29 C.F.R. § 785.19, and lack of paid rest breaks as mandated under 29 C.F.R. § 785.18.

## Count 4. Intentional Infliction of Emotional Distress

- Plaintiff realleges and incorporates the preceding paragraphs fully set forth herein.
- The plaintiff was subjected to extreme and outrageous working conditions, including forcing overtime, failing to provide bona fide meal periods, and allowing conditions that did not meet basic human needs, such as inadequate bathroom access, seating, and food safety.
- The respondent also penalized the plaintiff by assigning points for delays caused by employer conditions and mandated overtime on top of these conditions.
- This was done with reckless disregard for the probability that these unlawful acts would cause her harm.

## Supporting Case Law

Prior cases have established that if an employer's environment prevents an employee from fully utilizing their break time, such time may be compensated.

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946) ( U.S. Supreme Court provided that preliminary activities, after arriving at work, must be compensated accordingly).

In the case of Jewell Ridge Coal Corp. v. United Mine Workers of America, 325 U.S. 161 (1945), the court upheld the principle that when an employer's work environment restricts an employee's freedom during breaks, the time spent may be compensable.

Based on the facts, Tyson employs over 999 individuals, has a parking lot with a maximum capacity of 300 cars, a Cafeteria with a maximum capacity of 200, locker spaces that can accommodate up to 250, and limited bathroom stalls. Additionally, there is a requirement to clock out before retrieving personal items and lunch. The work environment here restricts employees from completely utilizing their breaks. The lack of lawful breaks and managerial indifference contributed to working conditions that were so intolerable that the petitioner had to resign.

To maintain an actionable claim for intentional infliction of emotional distress, one must prove the following: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress. Dickens v. Puryear, 302 N.C. 437, 276 S.E.2d 325 (1981). In Hogan v. Forsyth Country Club Company, this Court extended a claim of infliction of emotional distress to include that which arises as a result of one's reckless indifference to the

likelihood that one's actions will cause severe emotional distress. 79 N.C.App. 483, 340 S.E.2d 116, disc. Review denied, 317 N.C. 334, 346 S.E.2d 140 (1986).

A jury must determine the first element of intentional infliction of emotional distress. It is a question of law for the court to decide, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery. However, once conduct is shown which may be reasonably regarded as extreme and absurd, it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability. Ruff v. Reeves Bros., Inc.468 S.E.2d 592 (1996)

The plaintiff was subjected to extreme and outrageous working conditions, including forced overtime, failure to provide bona fide meal periods, and the allowance of conditions that did not meet basic human needs, such as inadequate restroom access, seating, and food safety. This was done with reckless disregard for the likelihood that these unlawful acts would cause her harm. As a direct result of the Defendant's conduct, the plaintiff experienced serious health effects, including swelling, skin irritation, sleep deprivation, fatigue, and emotional distress instability.

**WHEREFORE**, the Plaintiff requests that the court award her

Economic damages: Payment of back wages, missed break compensation, lost benefits or employment opportunities, and liquidated damages as required by federal and state law, totaling $35,000.

Punitive damages should be either treble the amount of compensatory damages or $250,000, whichever is greater, for plaintiffs' IIED claim. This amount is to be determined by a jury.

Declaratory injunction honoring bona fide meal periods, paid rest breaks and compensation from herein for indispensable tasks performed before and after work for current Tyson Farms Inc employees.

On this day, the 28th of May 2025.

August 4th, 2025.

# Certificate of service

I hereby certify that I filed the foregoing pleading or other paper with the clerk of court electronically using the NC Courts Portal System- CM/ECF, which sent notification of the following to the foregoing. Furthermore, I have certified that I mailed the following documents using the United States Postal Service to the participants. 08/04/2025

From: Fatihaa Carroll

10315 Ringed Teal rd, Apt 307

Charlotte, North Carolina 28262

Email: Carrollfatihaa@outlook.com

Cell: 234.699.0561

To: Kevin Dalton, Sharon Suh

Fisher and Phillips LLP

227 West Trade Street Suite 2020

Charlotte, North Carolina 28202

Email: kdalton@fisherphillips.com

Email: ssuh@fisherphillips.com

Phone: 704.334.4565